**Adelaide ANDREWS, Plaintiff,**

v.

**TRANS UNION CORP. et al., Defendants.**

**No. CV 96–7369 LGB VAPX.**

United States District Court,
C.D. California.

May 27, 1998.

From those reports, and the rest of the record, this Court can conduct an adequate de novo review.

Gus T. May, Edward P. Howard, Laura N. Diamond, Victor T. Fu, Center for Law in Public Interest, Los Angeles, CA, Carlyle W. Hall, Jr., Andrew R. Henderson, Bethany A. Dreyfus, Hall & Associates, Los Angeles, CA, Gerald L. Sauer, Sauer & Wagner L.L.P., Los Angeles, CA, for Adelaide Andrews.

Daniel J. McLoon, Kevin R. Lussier, Vick K. Mansourian, Jones, Day, Reavis & Pogue, Los Angeles, CA, for TRW Inc.

Donald E. Bradley, Crowell & Moring LLP, Irvine, CA, Monica L. Thompson, Michael O'Neil, Rudnick & Wolfe, Chicago, IL, for Trans Union Corp.

## ORDER GRANTING IN PART AND DENYING IN PART TRANS UNION'S MOTION FOR SUMMARY JUDGMENT AND GRANTING TRW'S MOTION FOR PARTIAL SUMMARY JUDGMENT.

BAIRD, District Judge.

### I. Introduction

Plaintiff Adelaide Andrews has sued Defendants, two credit reporting agencies, over the way they handled her credit information. Each Defendant filed a separate Motion for Summary Judgment or Partial Summary Judgment. These Motions came on regularly for hearing on May 18, 1998. Having reviewed all pertinent papers on file and considered the oral argument of counsel, for the reasons discussed below, the Court will rule as follows:

Defendant Trans Union's Motion for Summary Judgment is GRANTED in part and DENIED in part as follows: Defendant Trans Union's Motion on Plaintiff's improper disclosure (§ 1681e(a)) claim is GRANTED. Defendant Trans Union's Motion on Plaintiff's accuracy (§ 1681e(b)) claim, reinvestigation (§ 1681i(a)) claim, state law (§ 17200) claim, request for punitive damages, and request for injunctive relief is DENIED.

Defendant TRW's Motion for Partial Summary Judgment is GRANTED in all respects, including Plaintiff's improper disclosure (§ 1681e(a)) claim, request for punitive damages, and request for injunctive relief. Additionally, Defendant TRW's Motion for Summary Adjudication that Plaintiff did not incur any economic damages in the form of higher interest expenses relating to TRW's furnishing her credit report to Chase is likewise GRANTED.

### II. Procedural Background

Plaintiff Adelaide Andrews ("Plaintiff") filed this Complaint against Trans Union Corporation, Inc. and TRW, Inc. ("Defen-

dants") on October 21, 1996 alleging four causes of action for violation of the Fair Credit Reporting Act ("FCRA"), as amended, 15 U.S.C. §§ 1681 *et seq.*, and state law:

(1) Both Defendants wrongfully disclosed Plaintiff's consumer reports in violation of 15 U.S.C. §§ 1681b and 1681e(a);

(2) Both Defendants failed to employ reasonable procedures to assure maximum possible accuracy of Plaintiff's consumer reports in violation of 15 U.S.C. § 1681e(b);

(3) Defendant Trans Union failed to reasonably reinvestigate and promptly delete misinformation in Plaintiff's consumer reports in violation of 15 U.S.C. § 1681i(a);

(4) Both Defendants, by the acts and omissions entailed in the above federal allegations, have also violated California Business and Professions Code §§ 17200, *et seq.*

Plaintiff seeks injunctive and declaratory relief, actual and punitive damages in amounts to be determined at trial, disgorgement of any profits resulting from the state law violation, and attorneys' fees and costs.

Plaintiff alleges that when she sought a residential mortgage on or about May 31, 1995, the bank indicated delinquent information existed in Plaintiff's credit report. Plaintiff alleges that this negative information was a result of identity fraud because, although the social security number, last name, and first initial were hers, the other information (first name, date of birth, and address) belonged to an imposter.

Accordingly, Plaintiff alleges that both Defendants, credit reporting companies, violated their duties under the Fair Credit Reporting Act, 15 U.S.C §§ 1681, *et seq.*, by releasing her credit report without sufficient identification, thereby allowing the imposter to open the fraudulent accounts, and by not promptly rectifying the misinformation after Plaintiff advised them of the dispute and investigation.

Although Defendants both subsequently removed the delinquent misinformation, Trans Union retained the inquiries on Plaintiff's consumer report. Further, Plaintiff alleges sustained distress, commercial impairment, and loss of time and money. Plaintiff also alleges that the emotional distress caused a flare-up of her preexisting Lupus condition.

Plaintiff filed her complaint in this court on October 21, 1996. On October 20, 1997, this Court denied Defendant Trans Union's Motion for Leave to File Third–Party Complaint, which sought to implead the imposter as a third-party defendant. The Court held that Defendant Trans Union had no right of contribution or indemnity against the alleged imposter, and thus, impleader was improper.

On March 24, 1998, Defendant Trans Union filed a Motion for Leave to File an Amended Answer. Since this Motion was noticed to be heard after the Motions Cut–Off date, it also sought to amend the scheduling order. By Order filed on April 15, 1998, The Court granted this Motion.

On February 23, 1998, each Defendant filed their own Motion for Summary Judgment or Partial Summary Judgment. On March 2, 1998, Plaintiff filed her Oppositions. On March 9, 1998, Defendants filed their Replies. A hearing was held on May 18, 1998.[1]

### III. Detailed Factual Background

The following facts are undisputed, at least for the purposes of these Motions, unless otherwise noted:[2]

### A. How the Consumer Reporting Agencies Operate and are Regulated

Defendants were both consumer reporting agencies governed by the FCRA during the time period relevant to this case.[3] (Pl.'s

---

1. The Court takes this opportunity to note the uniformly high quality of the legal work performed by all parties on these Motions.

2. Plaintiff's objection to the Bayer Affidavit and TRW's objections to the Hendricks Declaration need not be decided, as the Court did not consider this evidence for purposes of this Order.

TRW's objections to the Parker Declaration are addressed below.

3. As of September 19, 1996, TRW is no longer a consumer reporting agency, having sold its consumer reporting business. (Pl.'s Stmt. Genuine Issues in Opp. to TRW's Mot. [hereinafter TRW Genuine Issues] ¶ 2.)

Stmt. Genuine Issues in Opp. to Trans Union's Mot. [hereinafter TU Genuine Issues] ¶ 1; TRW Genuine Issues ¶ 1.) Each Defendant maintained a computer system which stored credit information about hundreds of millions of consumers—Trans Union's system is named CRONUS and TRW's system was named the Legacy System. (TU Genuine Issues ¶ 7; TRW's Reply to Genuine Issues ¶ 3.)

Defendants' computers have two main functions. The first is to receive information from large creditors, such as department stores, credit card issuers, banks, etc. This information consists of things like repayment history, credit limits, balances, etc., on individual consumers. Thus, Defendants' computers are repositories of huge amounts of consumer credit information. (*See generally,* TRW's Reply to Genuine Issues ¶ 3; TU Genuine Issues ¶ 7 at 3, ¶ 2 at 25.)

The second function of Defendants' computers is the key to this case. Their computers allow Defendants' "subscribers" to access the data in real-time for various purposes, such as to facilitate credit transactions. For example, when a subscribing credit grantor is contemplating extending credit to a consumer, the credit grantor obtains a report from Defendants describing the consumer's past use of credit. Based on the contents of that report, the credit grantor can make an informed decision whether to grant or deny credit. Defendants' computers are programmed to analyze a subscriber's request for a report and compare the identifying information (i.e., the name, address, social security number, etc.) with the data in the computer. Based on a proprietary scheme, Defendants' computers release information that is "sufficiently" similar to the identifying information in the request. In other words, a subscriber's request for a report on Steve Smith may return information listed under Steve Smith, Steven Smith, S. Smith, etc., depending on how closely the other identifying information matches. In the instant case, as will be described in more detail below, both Defendants' computers released Plaintiff's information based on an exact match of her social security number, last name, and first initial.

Consumer reporting agencies are regulated by the FCRA, 15 U.S.C. § 1681 *et seq.* The FCRA imposes a number of specific requirements on consumer reporting agencies, several of which Plaintiff alleges that Defendants violated. These will be discussed in detail below.

In enacting the FCRA, Congress made several findings, and enunciated a statement of purpose. These are as follows:

The Congress makes the following findings:

(1) The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system. . . .

(2) An elaborate mechanism has been developed for investigating and evaluating the credit worthiness, credit standing, credit capacity, character, and general reputation of consumers.

(3) Consumer reporting agencies have assumed a vital role in assembling and evaluating consumer credit and other information on consumers.

(4) There is a need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy.

It is the purpose of this subchapter to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information in accordance with the requirements of this subchapter.

15 U.S.C. § 1681. Having described the general functioning of consumer reporting agencies such as Defendants and the purpose of the FCRA, the Court next turns to a description of the relevant transactions in this case.

## B. Plaintiff and the Imposter

There is little dispute about the underlying factual events which transpired in this case. The differences between the parties are in their interpretation of the legal effect of those events.

Plaintiff's name is Adelaide Andrews. At the relevant time period she lived in Santa Monica, CA. On June 17, 1993, Plaintiff went to a radiological medical office in Santa Monica, Lebovic, Schwimer & Goldberg, for a procedure. (Lussier Decl.Ex. F (Andrews Depo.) at 5; Ex. G (Lebovic Depo.) at 14.) This visit was her first to Lebovic. (Lussier Decl.Ex. G at 14.) Plaintiff completed a "Patient Information" form, listing her name, birthdate, home address, home phone number, driver's license number, and employment. (*Id.* at 52 (copy of the form).) After Plaintiff completed this form, she handed it to Lubovic's receptionist—one Andrea Andrews (the "Imposter"). (*Id.* at 18.) The Imposter had complete access to this form and the information contained thereon. It is undisputed that this is the way the Imposter received the identifying information about Plaintiff—from Plaintiff herself, not from Defendants. (TU Genuine Issues ¶ 5; TRW Genuine Issues ¶ 12.)

The Imposter subsequently moved to Las Vegas, and began impersonating Plaintiff. On August 5, 1994, the Imposter entered into an apartment lease at 4201 South Decatur Blvd. in Las Vegas, using the name "Adelaide (Andrea) Andrews" as well as Plaintiff's social security number and driver's license number. (Lussier Decl.Ex. H (copy of lease).) The Imposter also obtained telephone and electric service, apparently in Plaintiff's name. Apparently no credit reports were obtained for these three transactions.

In addition to these transactions, the Imposter made five other attempts to obtain credit using Plaintiff's identity. It is these five attempts that form the bulk of Plaintiff's suit. One of these attempts involved Trans Union—On October 22, 1994, the Imposter applied for credit at Dillard's, a department store in Las Vegas. (TU Genuine Issues ¶ 20.) Dillard's furnished to Trans Union the name "Andrea Andrews," her Las Vegas Address, and Plaintiff's social security number. (*Id.*) At that time, Trans Union had a file on Andrea Andrews with the Las Vegas Address and no social security number. (*Id.* ¶ 21.) Trans Union also had two files on Plaintiff, both under the name "Adelaide E. Andrews" with Plaintiff's social security number. (*Id.* ¶ 22.) One of these listed Plaintiff's Santa Monica Address, and one listed a Texas address, apparently a former address of Plaintiff. (*Id.*) Trans Union passed all three files on to Dillard's. Plaintiff's files were passed on because of the exact match on the social security number, last name, and first initial. (*Id.* ¶ 23.) Plaintiff's files carried a "Trans Alert" warning to Dillard's that the addresses in Trans Union's file did not match the address supplied by Dillard's. (*Id.* ¶ 24.) The Imposter's file was passed on because of the match on the name and address. (*Id.* ¶ 26.) After receiving the reports, Dillard's granted the Imposter credit; this account later went delinquent.

The Imposter's other four attempts to gain credit involved TRW credit reports. On July 25, 1994, TRW provided a credit report to FCNB Preferred Charge. (TRW Genuine Issues ¶ 4.) On September 27, 1994, TRW provided a credit report to Prime Cable of Las Vegas. (*Id.* ¶ 5.) On October 28, 1994, TRW provided a credit report to Express. (*Id.* ¶ 13.) Finally, on January 3, 1995, TRW provided a credit report to Commercial Credit. (*Id.* 15.) As with Trans Union's Dillard's report, Plaintiff's credit report was provided because the Imposter used Plaintiff's exact social security number, last name, and first initial, although different addresses, birthdates, etc. (Lussier Decl.Ex. J (FCNB requested report on "Andrea A. Andrews" with Plaintiff's social security number); Ex. K (Express requested report on "Andrea Andrews" with Plaintiff's social security number); Ex. L (Commercial requested report on "Adelia de Andrews" with Plaintiff's social security number).) It is undisputed that the Imposter's credit applications to FCNB, Express, and Commercial Credit were all denied. (*See* Lussier Decl.Ex. M (Pl.'s 2d. Supp.Resp. to Interrog.); TRW

Genuine Issues ¶¶ 14, 17.) [4]

## C. Plaintiff's Discovery of the Imposter's Activities

On May 31, 1995, Plaintiff went to the Santa Monica office of Home Savings of America to inquire about refinancing the mortgage on her home. (Lussier Decl.Ex. F (Andrews Depo.) at 104–05.) In connection with this inquiry, Home Savings obtained a credit report on Plaintiff from Chase Credit Research, a nonparty credit reporting agency. (TU Genuine Issues ¶ 28.) Chase prepared this credit report by obtaining credit reports on Plaintiff from Defendants Trans Union and TRW, and non-party credit reporting agency Equifax. (*Id.* ¶ 29.) Chase combined the information from these three individual credit reports into a composite report which it furnished to Home Savings. (*Id.* ¶¶ 29–30.)

The Chase report listed the Imposter's Dillard's account as being delinquent. (Cohan Depo.Ex. 151 (the Chase Report) at 3.) This information was attributed to Trans Union and/or TRW. (*Id.* (noted on the Chase report as "TRW/TU").) After seeing this derogatory information on the Chase report, Plaintiff did not apply for the loan with Home Savings, allegedly believing that it would not be approved. Instead, she obtained a second trust deed equity line with Merrill Lynch, allegedly at a higher interest rate.

## D. Defendants' Response to the Plaintiff's Problem

After becoming aware of the problems caused by the Imposter, Plaintiff contacted both Defendants to resolve the problems. Plaintiff does not allege any claim against TRW for an inadequate reinvestigation of her credit file. Plaintiff's inadequate reinvestigation claim is asserted only against Trans Union. (Complaint at 9.)

Plaintiff first contacted Trans Union regarding the problems on June 5, 1995. (TU Genuine Issues ¶ 35.) On that same day, Trans Union placed a "fraud notice" on Plaintiff's credit report, stating: "FRAUD VICTIM; DO NOT EXTEND CREDIT WITHOUT FIRST CONTACTING ME PERSONALLY AND VERIFYING ALL APPLICANT INFORMATION." (*Id.* ¶ 41.) On or about June 22, 1995, Trans Union contacted Dillard's and determined that the Dillard's account was obtained fraudulently and did not belong to Plaintiff. (*Id.* ¶ 51.) On or about June 22, 1995, Trans Union manually suppressed the Dillard's delinquency from being disclosed in response to inquiries about Plaintiff. (*Id.* ¶ 52.) However, Plaintiff's credit report continued to show an "inquiry" by Dillard's, indicating that Plaintiff's credit report had been disclosed to Dillard's on October 22, 1994 (the day the Imposter applied for credit). (*Id.* ¶ 54.)

## IV. Standard for Summary Judgment

Summary judgment must be entered against a party who, after adequate time for discovery and upon motion, fails to make a showing sufficient to establish an element essential to that party's case, and on which that party would bear the burden of proof at trial. Fed .R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A party moving for summary judgment may carry its initial burden by pointing out to the district court that there is an absence of a genuine issue of material fact. *Id.* at 323, 106 S.Ct. 2548.

To avoid summary judgment, the non-movant must set forth specific facts showing that there remains a genuine issue of material fact for trial. *Id.* at 324, 106 S.Ct. 2548. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in the non-movant's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the non-moving party's evidence is merely colorable or is not significantly probative, then summary judgment may be granted. *Id.* at 249–50, 106 S.Ct. 2505.

### V. Analysis

As described above, Plaintiff's Complaint asserts four causes of action: 1) improper disclosure of her credit report; 2) inadequate

---

**4.** Although Prime Cable opened an account in Plaintiff's name, there is a dispute as to whether "credit" was granted; however, as discussed below, the Court need not resolve this dispute.

procedures for assuring "maximum possible accuracy" of her credit file; 3) improper reinvestigation of her file by Defendant Trans Union only; and 4) violation of California's Unfair Trade Practices Act.

Defendants have each separately moved for summary judgment or partial summary judgment on various aspects of Plaintiff's Complaint: Both Defendants move for summary judgment on Plaintiff's "improper disclosure" count. Only Defendant Trans Union moves for summary judgment on Plaintiff's "accuracy" count; TRW chose not to so move. Trans Union is the only defendant against whom the "reinvestigation" count is alleged, and Trans Union moves for summary judgment on this count. Defendant TRW moved for summary adjudication that Plaintiff did not incur any economic damages in the form of higher interest expenses relating to TRW's furnishing her credit report to Chase. Only Trans Union moved for summary judgment on Plaintiff's state law claim. Both Defendants moved for summary adjudication on Plaintiff's request for punitive damages. Both Defendants also moved for summary adjudication on Plaintiff's request for injunctive relief, although for different reasons. These issues will each be addressed in turn.

### A. Plaintiff's "Improper Disclosure" Claim

This claim is made under 15 U.S.C. § 1681e(a), which provided [5] that:

Every consumer reporting agency shall maintain reasonable procedures designed to ... limit the furnishing of consumer reports to the purposes listed under section 1681b of this title. These procedures shall require that prospective users of the information identify themselves, certify the purposes for which the information is sought, and certify that the information will be used for no other purpose. Every consumer reporting agency shall make a reasonable effort to verify the identity of a new prospective user and the uses certified

by such prospective user prior to furnishing such user a consumer report. No consumer reporting agency may furnish a consumer report to any person if it has reasonable grounds for believing that the consumer report will not be used for a purpose listed in section 1681b of this title.

15 U.S.C. § 1681e(a). The permissible purposes for which a consumer reporting agency may furnish reports are enumerated in section 1681b of the FCRA, as follows:

A consumer reporting agency may furnish a consumer report under the following circumstances and no other:

. . . .

(3) To a person which it has reason to believe—

(A) intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer; or

(E) otherwise has a legitimate business need for the information in connection with a business transaction involving the consumer.

15 U.S.C. § 1681b.

Plaintiff's improper disclosure claim is asserted against Trans Union based on its furnishing Plaintiff's report to Dillard's, and against TRW based on its furnishing Plaintiff's report to FCNB, Prime Cable, Express, and Commercial, in response to the Imposter's applications for credit. Plaintiff argues that these disclosures were not made for a permissible purpose, because Plaintiff's file was disclosed based on a credit application by the Imposter. Before addressing this issue, the Court must first address a threshold inquiry—the statute of limitations.

### 1. The Effect of the Statute of Limitations

■ Section 1681p of the FCRA provided that:

---

**5.** The FCRA was extensively amended in 1996, with an effective date for the amendments of September 1997. Because all of the events in this case took place before that time, the old version of the FCRA is applicable. Accordingly, all statutory references in this Order are to the pre-1996 Amendment version of the FCRA.

An action to enforce any liability created under this subchapter may be brought in any appropriate United States district court without regard to the amount in controversy, or in any other court of competent jurisdiction, within two years from the date on which the liability arises, except that where a defendant has materially and willfully misrepresented any information required under this subchapter to be disclosed to an individual and the information so misrepresented is material to the establishment of the defendant's liability to that individual under this subchapter, the action may be brought at any time within two years after discovery by the individual of the misrepresentation.

15 U.S.C. § 1681p. This section clearly establishes a two year statute of limitations, within which time an action must be brought. It is undisputed that the FCNB and Prime Cable disclosures were made more than two years before the filing of the Complaint in this case. Consequently, TRW argues that these two disclosures cannot form the basis of any liability. In contrast, Plaintiff argues that the limitations period does not begun to run until she knew or should have known of TRW's violation—the "discovery" rule. It is undisputed that if the discovery rule applies, then all the disclosures were made within the limitations period. Thus, the question for the Court, is the purely legal question of whether § 1681p includes an implied discovery rule.

An initial examination of the plain language of the statute suggests that there is no general discovery rule. The statute provides a two year limitations period, and a specific exception. When this exception applies, the limitations period is two years after discovery of the misrepresentation; however, this exception does not apply in this case, since there was no information required to be disclosed—Plaintiff does not argue otherwise.

■ "Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent." *Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616–17, 100 S.Ct. 1905, 64 L.Ed.2d 548 (1980); *In re McLinn*, 744 F.2d 677, 683 (9th Cir.1984). Thus, although Plaintiff argues that the discovery rule is normally read into statutes of limitations unless Congress has provided otherwise, *see Holmberg v. Armbrecht*, 327 U.S. 392, 397, 66 S.Ct. 582, 90 L.Ed. 743 (1945), this appears to be such a case where Congress provided otherwise.

The Ninth Circuit has not addressed this issue in a published decision. However, numerous other Circuits have. The Third, Seventh, and Tenth Circuits have all held that § 1681p is not a discovery statute, except in the enumerated circumstance. *See Houghton v. Insurance Crime Prevention Inst.*, 795 F.2d 322, 325 (3d Cir.1986); *Rylewicz v. Beaton Serv., Ltd.*, 888 F.2d 1175 (7th Cir.1989); *Clark v. State Farm Fire & Cas.*, 54 F.3d 669 (10th Cir.1995). Additionally, district courts in the Ninth and Eleventh Circuits have also held the same way. *See Allen v. Equifax Credit Co., Inc.*, 1993 WL 483036 (D.Or. 1993);[6] *Wilson v. Porter*, 921 F.Supp. 758 (S.D.Fla.1995). Only the Fifth Circuit has partially gone the other way. *See Hyde v. Hibernia Nat'l Bank*, 861 F.2d 446 (5th Cir. 1988). In *Hyde*, the Fifth Circuit created a two-tiered system, whereby negligent violations were not subject to the discovery rule, while intentional violations were. However, *Hyde* failed to discuss the effect of the enumerated exception in § 1681p on the inquiry under *Andrus*. For this reason, *Hyde* is not persuasive. *See Clark*, 54 F.3d at 672 (criticizing *Hyde* on this basis).

Plaintiff argues that this Court should look to a Ninth Circuit case finding that a "similar" statute to the FCRA, the Privacy Act, had a discovery statute of limitations. However, the Privacy Act and the FCRA are not the same, and do not share the same purposes. The FCRA's purpose is to balance the needs of commerce and the rights of consumers. *See* 15 U.S.C. § 1681 (quoted above). The Privacy Act's "main purpose" is to "forbid disclosure [of certain information] unless such disclosure is required by the [Freedom of Information Act]." *Lovell v. Alderete*, 630 F.2d 428, 431 n. 12 (5th Cir.1980).

**6.** *Allen* was affirmed by the Ninth Circuit in an unpublished disposition.

*See also Miller v. United States,* 630 F.Supp. 347, 348 (E.D.N.Y.1986) ("the purpose of [the Privacy Act] is to give individuals greater control over the gathering, dissemination, and accuracy of agency information about themselves").[7]

For these reasons, the Court agrees with the great weight of authority and holds that the discovery rule does not apply to the FCRA except in the one enumerated circumstance which does not apply to this case. Consequently, any claim for liability based on the FCNB and Prime Cable disclosures is barred by § 1681p.

## 2. Were the Three Remaining Disclosures Made in Violation of § 1681e(a)?

Having concluded that the discovery rule does not apply to this case, the three potentially actionable disclosures of Plaintiff's credit file were Trans Union's disclosure to Dillard's and TRW's disclosures to Express and Commercial. The Court will now consider whether these disclosures were lawful.

The full text of the applicable statute, 15 U.S.C. § 1681e(a), has been quoted above. Stripped to its essence, this section of the FCRA requires consumer reporting agencies to maintain "reasonable procedures" designed to limit disclosures of consumer credit reports to the permissible purposes enumerated in 15 U.S.C. § 1681b. The pertinent permissible purposes of § 1681b were also quoted above. These permissible purposes are disclosures to users who the consumer reporting agency has reason to believe intend to use the information in connection with a credit transaction involving the consumer, or otherwise have a legitimate business need for the information in connection with a business transaction involving the consumer. *See* 15 U.S.C. § 1681b(3)(A), (E).

■ Although there is a surprising paucity of cases interpreting the § 1681e(a) standard, a few general principles can be dis-

cerned. Initially, the analysis of a § 1681e(a) claim can be divided into two prongs. First, the Court must decide whether the consumer reporting agency made the disclosure to a person it had reason to believe had a statutorily authorized purpose for obtaining the report. If in fact the disclosure was made for a permissible purpose, then the inquiry ends, and no investigation of the reasonableness of the consumer reporting agency's procedures are necessary. *Middlebrooks v. Retail Credit Co.,* 416 F.Supp. 1013, 1016 (N.D.Ga.1976); *see also Alexander v. Moore & Assocs., Inc.,* 553 F.Supp. 948, 954 (D.Haw.1982). Although these cases are not controlling, being only district court cases, this Court finds the analysis of *Middlebrooks* persuasive.[8] It makes no sense for a consumer whose file was disclosed only for permissible purposes to nevertheless be able to challenge the reasonableness of the consumer reporting agency's procedures. Rather, only a consumer whose file was disclosed for an impermissible purpose may challenge the reasonableness of the reporting agency's procedures.

■ Once the consumer has shown that their file was disclosed for an impermissible purpose, that does not end the inquiry. The FCRA does not provide for strict liability; liability is imposed only when the consumer reporting agency either willfully or negligently fails to maintain reasonable procedures to avoid improper disclosures. *Dobson v. Holloway,* 828 F.Supp. 975, 977 (M.D.Ga. 1993); *see also* 15 U.S.C. §§ 1681n & 1681o.

Thus, in the context of this case, the Court must first determine whether Plaintiff has raised a genuine issue of material fact as to whether the disclosures were improper. If so, the Court must make the same inquiry as to whether defendants have maintained reasonable procedures.

### a. Were the Disclosures Permissible?

■ Plaintiff argues that the disclosures were not reasonable, because they were not

---

7. Plaintiff also fails to explain why two of the Circuits holding that the discovery rule does not apply to the FCRA have nevertheless held that it does apply to the Privacy Act. *See Bowyer v. United States Air Force,* 875 F.2d 632, 636 (7th Cir.1989); *Bergman v. United States,* 751 F.2d 314, 316 (10th Cir.1984). Thus, there is no nec-

essary correlation between whether the discovery rule applies to the Privacy Act and whether it applies to the FCRA.

8. The Court located no contrary authority.

furnished for a legitimate, statutorily authorized purpose, since Plaintiff's report was disclosed in response to the Imposter's applications for credit. As noted above, § 1681b(3) permits disclosures

> to a person which [the reporting agency] has reason to believe:
>
> > (A) intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer; or
> >
> > . . . .
> >
> > (E) otherwise has a legitimate business need for the information in connection with a business transaction involving the consumer."

15 U.S.C. § 1681b(3)(A), (E). Essentially, Plaintiff argues that the creditors obtaining her report were not intending to use the information in connection with a credit transaction involving *her*, but rather, in a transaction involving the *Imposter*. Although this argument is creative, the Court does not agree with it. Initially, Plaintiff has pointed to no authority adopting this argument. More importantly, it places too heavy a burden on consumer reporting agencies. Under Plaintiff's theory, any time an imposter adopted a consumer's identity, the disclosure of the consumer's information in response to a credit application by the imposter would be per se impermissible. Then the inquiry about the reasonableness of the reporting agency's procedures would always need to be conducted.

Additionally, a common sense reading of § 1681b is contrary to Plaintiff's position. In an imposter situation such as the case at bar, the recipient of the consumer's report (i.e., the potential creditor to the imposter) "intends to use the information in connection with a credit transaction involving the con-

sumer." The consumer is "involved" in the transaction, because the imposter is purporting to *be* the consumer. Although in a strictly technical sense the transaction does not involve the "extension of credit to ... *the consumer*," § 1681b(3)(A), the Court finds this not to be dispositive. Moreover, § 1681b(3)(E) plainly appears applicable to these situations—a planned creditor of an imposter has a "legitimate business need" for the credit report of the person the imposter is impersonating.[9] By obtaining this information, the potential creditor may learn information making them suspicious of the imposter, leading them to deny credit. For example, TRW has

> trained its subscribers that an effective method to prevent occurrences of identity theft is for the credit grantor to carefully scrutinize inconsistencies between information provided by a [credit applicant] and information included in a TRW credit report provided to the subscriber and to pose questions to the applicant that only the genuine consumer would be able to correctly answer.

(TRW Genuine Issues ¶ 10.)

For the foregoing reasons, the Court finds as a matter of law that disclosing a consumer's credit report in response to a credit application by an imposter impersonating the consumer by use of the consumer's identifying information is a disclosure for a permissible purpose under the FCRA, and accordingly, is not actionable under § 1681e(a). Therefore, no inquiry about the reasonableness of Defendants' procedures need be conducted, and Defendants' Motions for Partial Summary Judgment on Plaintiffs disclosure claim (count I) are GRANTED. Nevertheless, the Court will briefly address the reasonableness of Defendants' procedures as further support for its decision.

---

**9.** At oral argument Plaintiff noted that § 1681b(3)(E) concluded with the term "involving *the* consumer" not "involving *a* consumer." Thus, Plaintiff argued, this section only applies when the subscriber has a legitimate business need for the information about the particular individual for whom the report is going to be provided. However, this argument misses the point—an individual is "involved" in a business transaction when a creditor contemplates extending credit to an imposter impersonating that individual. Despite not having chosen to enter a business transaction, that individual has nevertheless become involved by the actions of the imposter.

## b. Were Defendants' Procedures Reasonable?

As discussed above, even when a consumer reporting agency makes an improper disclosure, liability attaches only upon a showing that the reporting agency willfully or negligently failed to maintain "reasonable procedures" designed to limit disclosures to those made for permissible purposes. *See* 15 U.S.C. § 1681e(a). Initially, the statute enumerates several requirements for those "reasonable procedures." "These procedures shall require that prospective users of the information identify themselves, certify the purposes for which the information is sought, and certify that the information will be used for no other purpose." *Id.* Additionally, "every consumer reporting agency shall make a reasonable effort to verify the identity of a new prospective user and the uses certified by such prospective user prior to furnishing such user a consumer report." *Id.* Further, "no consumer reporting agency may furnish a consumer report to any person if it has reasonable grounds for believing that the consumer report will not be used for a purpose listed in § 1681b of this title." *Id.*

There is no dispute that Defendants fully complied with these enumerated requirements. Trans Union has obtained a certification from Dillard's that it will request credit reports only for permissible purposes, and Trans Union has investigated the nature of Dillard's business (it is a retailer of goods which extends consumer credit) to confirm that Dillard's has a legitimate need for consumer credit reports. (*See* TU Genuine Issues ¶¶ 18, 19.) TRW has obtained similar certifications from Express and Commercial, and has conducted similar investigations of those businesses to determine that they have a legitimate need for consumer credit reports. (*See* TRW Genuine Issues ¶¶ 6, 7.)[10]

■ Plaintiff argues that compliance with these enumerated requirements is necessary, but not sufficient, to maintain "reasonable procedures" as required by § 1681e(a). This is true. It is apparent that despite having these blanket certifications from its subscribers, if Defendants released credit reports based on only a last name for instance, so that a subscriber's request for credit reports on everyone named "Smith" disclosed all such reports, this would not be reasonable. This, however, is not the situation presented in this case.

■ Plaintiff argues that summary judgment is rarely, if ever, appropriate, because the mere fact of an improper disclosure permits a jury to infer that the reporting agency's procedures were unreasonable. (*See, e.g.,* Pl.'s Opp. to TRW's Motion at 15–17.) This argument erroneously conflates the "disclosure" analysis of § 1681e(a) with the "accuracy" analysis of § 1681e(b). As will be discussed below, the standard under § 1681e(b) is much higher than it is under § 1681(e)(a). *Compare* 15 U.S.C. § 1681e(a) ("every consumer reporting agency shall maintain reasonable procedures designed to ... limit [disclosures to those for permissible purposes]") *with* 15 U.S.C. § 1681e(b) ("[consumer reporting agencies] shall follow reasonable procedures to *assure maximum possible accuracy*"). Thus, Plaintiff's citation of cases applying § 1681e(b) is not persuasive in the § 1681e(a) arena.

Moreover, several cases *have* granted summary judgment to reporting agencies facing

10. At oral argument Plaintiff argued that Defendants failed to comply with the final sentence of § 1681e(a), which provides that "no consumer reporting agency may furnish a consumer report to any person if it has reasonable grounds for believing that the consumer report will not be used for a purpose listed in section 1681b of this title." 28 U.S.C. § 1681e(a). Plaintiff characterized this sentence as requiring that Defendants could not disclose information if they had reasonable grounds for believing that information about a different person than was standing before the potential creditor was involved. Thus, Plaintiff argued, whenever Defendants disclosed information that they had reason to believe pertained to two individuals, they necessarily made an improper disclosure as to at least one of them. However, this argument, as discussed above, fails to acknowledge that more than one person may be "involved" in a particular business transaction; i.e., when the Imposter requested credit by impersonating Plaintiff, both the Imposter and the Plaintiff were involved in the transaction. Accordingly, Defendants' disclosure of both of their files was for a permissible purpose as a matter of law. Thus, Plaintiff points to no evidence that Defendants ever had reasonable grounds for believing that information they were about to furnish was not going to be used for a permissible purpose.

disclosure claims. The most illuminative of these cases is *Dobson v. Holloway*, 828 F.Supp. 975 (M.D.Ga.1993).[11] In *Dobson*, June Dobson and her husband Kenneth D. Dobson were negotiating to buy an automobile. The automobile dealer entered into its computer the name Kenneth D. Dobson, his address at 301 Willow, and social security number of 260–47–6068. The Defendant credit bureau used a "weighted value" system much like Defendants' computers in the instant case, to determine which consumer reports should be disclosed. Three files were disclosed: '

I. Kenneth D. Dobson at 210 Southland St., social security number 260–47–6068.

II. Kenneth V. Dobson at 210 Southland St., different social security number.

III. Dennis Dobson at 301 Willow, social security number 260–47–6068.

*Id.* at 977. Thus, the first report had the correct name and social security number, but a different address. The second report had a different middle initial, a different social security number, and a different address, although the address matched the address in the first report. The third report had a different first name, but the correct address and social security number. As it turned out, the first and third reports actually belonged to the consumer. The second report belonged to the consumer's father, who sued the reporting agency for an impermissible disclosure under § 1681e(a).

The *Dobson* district court assumed arguendo that the plaintiff's credit file was disclosed for an improper purpose, but nevertheless it granted the reporting agency's motion for summary judgment, finding that as a matter of law the agency's procedures were reasonable. *Id.* at 977–78. The court noted that the agency had a certification from the dealership that it would only request reports for permissible purposes, and that the agency knew that an automobile dealership had an obvious need for credit reports.

The court then considered the weighted value system for determining which reports were sufficiently similar to the request to be disclosed, and concluded that the agency's procedures were reasonable as a matter of law. The court considered and rejected the plaintiff's argument that the agency should have required a better match, or at least a matching social security number, before disclosing his file. *Id.* at 977. The court noted that if an exact social security number, or an exact name, was required for a file to be displayed, important relevant information would not be disclosed. For example, in *Dobson*, the third report indicated credit that the actual consumer had previously obtained under the name Dennis Dobson, rather than his actual name of Kenneth D. Dobson.[12] *Id.* Requiring a more exact match would have deprived the credit grantor of this relevant information. *Cf.* 15 U.S.C. § 1681(a)(1) ("the banking system is dependent upon fair and *accurate* credit reporting"; accuracy includes completeness).[13]

In the instant case, the disclosures were made on a better match than in *Dobson*. There, the social security number and address did not match, nor did the middle initial. In the instant case, the social security number matched exactly,[14] along

---

**11.** Plaintiff argues that *Dobson* conflicts with the "binding Ninth Circuit case of *Guimond* [*v. Trans Union Credit Information Co.*, 45 F.3d 1329 (9th Cir.1995), and] the vast weight of authority from other circuits." (*See* Pl.'s Opp. to TRW's Motion at 20.) However, Plaintiff fails to acknowledge that *Guimond* and the other cited authority involve *accuracy* claims under § 1681e(b), not *disclosure* claims under § 1681e(a). Thus, there is no conflict.

**12.** Presumably, the "D" in Kenneth D. Dobson stood for Dennis, although this is unclear.

**13.** This Court can take judicial notice of the fact that consumers: use different forms of their names in identifying themselves (nick names, in-

clusion/exclusion of middle names/initials, maiden names, hyphenated married names, etc.); change addresses; have multiple addresses (residence/business, summer/winter/vacation residences, school/permanent addresses, mailing addresses, etc.); and that typographical errors are made in reports of credit transactions from which consumer reporting agencies obtain information. *See* Fed.R.Evid. 201(b)(1). Moreover, there is evidence of such facts in the record. (*See* O'Neil Supp.Decl.Ex. A (Romanowski Decl.) ¶ 4.)

**14.** Plaintiff argues that attaching excessive weight to the social security number is unreasonable, because there are only one billion possible

with the last name and first initial. This match, in conjunction with the certifications by, and investigations of, Defendants' subscribers, constitutes a reasonable procedure designed to limit disclosures to those permissible under § 1681b.[15] Thus, this constitutes an independent grounds for GRANTING Defendants' Motions for Partial Summary Judgment on Plaintiff's disclosure claim.

## B. Plaintiff's "Accuracy" Claim

Plaintiff's "accuracy" claim is made under 15 U.S.C. § 1681e(b), which provided that:

> Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates.

15 U.S.C. § 1681e(b). Although Plaintiff asserts an accuracy claim against both Defendants, only Trans Union has moved for summary judgment on this claim.

■ As noted above, this section imposes a higher standard on consumer reporting agencies than § 1681e(a) does, due to the "assure maximum possible accuracy" language. A fairly recent Ninth Circuit case, *Guimond v. Trans Union Credit Information Co.*, 45 F.3d 1329 (9th Cir.1995), explains the analysis to be followed in "accuracy" cases brought under § 1681e(b). In *Guimond*, the Ninth Circuit reversed the district court's grant of summary judgment to the consumer reporting agency on a § 1681e(b) claim. Initially, the Ninth Circuit held that liability under 1681e(b) did not require the plaintiff to have suffered any pecuniary loss as a result of the inaccuracy in order to recover, nor is there any requirement that the plaintiff had been denied credit; the mere compilation and/or retention of erroneous information can be sufficient, if this caused the plaintiff some damage, such as emotional distress. *Id.* at 1333.

A consumer can establish a prima facie case under § 1681e(b) by presenting evidence tending to show that a credit reporting agency prepared a report containing inaccurate information. *Id.* Once the consumer does so, because the FCRA does not provide for strict liability, the consumer reporting agency can escape liability if it establishes that the inaccurate report was generated de-

---

15. social security numbers (since it is nine digits long); with approximately 250 million people in the United States, an imposter would have a one in four chance of guessing someone else's actual social security number. (*See* Pl.'s Opp to TRW's Motion at 20 n. 20.) This argument is frivolous, as nobody suggests using *only* a social security number as the identifying information enabling disclosure. While an imposter has a one in four chance of guessing *someone's* social security number, they have essentially *no* chance at all of guessing both their social security number and their name.

15. Plaintiff's Parker Declarations, by her computer expert, do not alter this analysis. Parker's testimony falls into several categories. First, Parker opines that "based upon a plain reading of 15 U.S.C. § 1681e(a), it is my opinion that Trans Union violated the mandate set forth in the first sentence of 15 U.S.C. § 1681e(a) in connection with Adelaide Andrews, claims...." (TU Parker Decl. ¶ 16.) (There is a similar quote regarding TRW in the TRW Parker Decl.; TRW objects to this Parker Declaration on a variety of grounds.) This opinion and several others like it are inadmissible because Parker lacks foundation to render legal conclusions; moreover, Defendants' liability does not rest on a computer expert's "plain reading" of a federal statute. Rath-

er, it is the duty of this Court to interpret the statute, in light of relevant authority, to discern its import. As described above, this Court finds as a matter of law that the disclosure of Plaintiff's file under the circumstances of this case was neither for an impermissible purpose, nor the result of unreasonable procedures. Either one of these findings is alone sufficient to support summary judgment.

Another category of Parker's testimony consists of his opinions that Defendants' computers and procedures were outmoded and better alternatives were available. (*See, e.g.*, TRW Parker Decl. ¶ 14 .) However, this testimony is irrelevant; to the extent it goes to Plaintiff's accuracy claims, where it may otherwise be relevant, TRW did not move on this claim, and Trans Union's Motion on this claim is denied, as explained below. To the extent that it goes to the Disclosure claims, the Court has held that the disclosures in question were for a permissible purpose and were reasonable as a matter of law. The expert testimony of a computer expert is not relevant to either of these determinations.

The other category of Parker's testimony contained within his declarations is factual information about Defendants' operations and the alternatives available. Given the Court's analysis, this factual information is irrelevant.

spite the agency's following reasonable procedures. *Id.* "The reasonableness of the procedures and whether the agency followed them will be jury questions in the overwhelming majority of cases." *Id.*

 Applying this analysis to the instant case, the burden is first on Plaintiff to raise a genuine issue of material fact that Trans Union prepared a report on her containing inaccurate information. If she does so, then Trans Union has an opportunity to show that it followed procedures which were reasonable as a matter of law; however, as the above quote from *Guimond* demonstrates, such proof of reasonableness is a question of fact for a jury in the "overwhelming majority" of cases.

 Plaintiff points to two things in her report which she contends are inaccurate: 1) the information Trans Union furnished to Chase Credit Research and 2) the Dillard's inquiry. These will be addressed in turn.

### 1. The Information Provided to Chase

As described above, Plaintiff went to Home Savings to inquire about refinancing the mortgage on her home. In connection with this inquiry, Home Savings obtained a credit report on Plaintiff from Chase Credit Research, a non-party credit reporting agency. Chase prepared this credit report by obtaining credit reports on Plaintiff from Defendants Trans Union and TRW, and non-party credit reporting agency Equifax. Chase combined the information from these three individual credit reports into a composite report which it furnished to Home Savings.

The Chase report listed the Imposter's Dillard's account as being delinquent. (Cohan Depo.Ex. 151 (the Chase Report) at 3.) This information was attributed to Trans Union and/or TRW. (*Id.*) Plaintiff argues that this attribution of the delinquent Dillard's account to Plaintiff was an inaccuracy on her report, establishing her prima facie case of a violation of § 1681e(b). Moreover, Plaintiff argues another inaccuracy, in that Trans Un-

ion reported a Capitol One account as being hers, even though it was not hers.

### a. The Capitol One Account

 Turning first to the Capitol One account, the Chase report does indeed list such an account as belonging to Plaintiff. (*See* TU May Decl.Ex. C. (the Chase report).) [16] Moreover, the Chase report clearly indicates that this information was provided only by Trans Union, unlike most of the other information, which was provided by several consumer reporting agencies. (*Id.*) Although the Capitol One account was listed as "current," if this account did not belong to Plaintiff, that would nevertheless be an inaccuracy meeting Plaintiff's burden and establishing her prima facie case.

Plaintiff argues in her Opposition that Trans Union reported that Plaintiff had an account with Capitol One, although she did not. (Pl.'s Opp. to TU's Mot. at 9:14–15.) As support, Plaintiff cites to the TU May Declaration Exhibits C and E. However, these exhibits do not show that the Capitol One account did not in fact belong to Plaintiff. Exhibit C is merely a copy of the Chase report; while it lists the Capitol One account as being reported by Trans Union, it does not indicate that the account did not actually belong to Plaintiff as she argues. Exhibit E is a June 6, 1995 letter from Plaintiff to a variety of people stating that he had just discovered that several things on her credit report were not hers, and that she was a victim of identity fraud. This letter lists five accounts as not belonging to Plaintiff: 1) Dillard's; 2) Prime Cable; 3) FCNB; 4) Express; and 5) Commercial. Notably absent from this list is Capitol One. Moreover, this letter indicates that it was sent to eleven recipients, including the five creditors listed above, Trans Union, TRW, Equifax, Chase, a collection agency, and the Reno Police; but not Capitol One. This suggests that perhaps the Capitol One account really is Plaintiff's, and that its listing was thus not an error.

---

**16.** Since Plaintiff is opposing separate Motions by each Defendant, she has filed separate Oppositions as well as supporting declarations for each Opposition. Plaintiff's Oppositions will be cited as "TRW Opp." for Plaintiff's Opposition to

TRW's Motion, and "TU Opp." for her Opposition to Trans Union's Motion. Similarly, the two "May" Declarations (one for each Opposition) will be cited as the "TRW May Decl." and the "TU May Decl."

Plaintiff's Statement of Genuine Issues in Opposition to Trans Union's Motion also states that "Plaintiff, however, has never applied for or maintained a consumer credit account with Dillard's or Capitol One." (TU Genuine Issues ¶ 13.) However, as support for this assertion, Plaintiff cites only to the TU May Declaration Exhibit B at 78:10–12, and 134:1–6, and Exhibit E. This evidence does not support Plaintiff's assertion either. Exhibit B consists of excerpts from Plaintiff's deposition. Page 78 addresses only the Dillard's account, not the Capitol One account. Page 134 mentions Capitol One, but only states that "an inquiry" was fraudulent. (TU May Decl.Ex. B at 134:1–6.) Moreover, Plaintiff went on to say that she believed that the Imposter was denied credit by Capitol One. (*Id.* at 134:7–10.) However, the Chase report lists the Capitol One account as being "current" with a balance of $605, indicating that it was an existing account. (TU May Decl.Ex. C.) Thus, again it appears that the Capitol One account may have belonged to Plaintiff, making Trans Union's report not inaccurate. At any rate, Plaintiff has failed to present admissible evidence, *see* Fed. R.Civ.Proc. 56(e), that the Capitol One account was not properly attributed to her.[17] Consequently, the Capitol One account does not support Plaintiff's accuracy claim under § 1651e(b).

### b. The Dillard's Delinquency

Plaintiff next argues that the Dillard's delinquency reported to Chase was an inaccuracy establishing her prima facie case under § 1681e(b). The Chase report does indeed list the Dillard's account as being delinquent and as belonging to Plaintiff. (*See* TU May Decl.Ex. C.) Additionally, it is undisputed that the Dillard's account did not belong to Plaintiff. (*See* TU Genuine Issues ¶ 51 ("Trans Union determined that the Dillard's account was obtained fraudulently and did not belong to plaintiff").) However, there are two other hurdles for Plaintiff to meet in

using the Dillard's account to establish inaccuracy under § 1681e(b): that it was Trans Union who reported the Dillard's account to Chase, and that Trans Union reported the delinquent Dillard's account as belonging to Plaintiff.

Unlike the Capitol One account which the Chase report indicates was reported only by Trans Union, the Dillard's account was reported by Trans Union and/or TRW. However, as will be discussed separately in Section V.D. below, TRW has provided evidence that its computer records showed the Dillard's account as being current as of the date of the Chase report. Consequently, there is at least a genuine issue of material fact that the delinquent status of the Dillard's account was reported to Chase by Trans Union.

A thornier issue is presented by whether Trans Union actually reported any inaccurate information at all. Plaintiff's theory is straightforward—Trans Union attributed the delinquent Dillard's account to Plaintiff in its report to Chase, which is an inaccuracy. In reply, Trans Union argues that it did no such thing; rather, according to Trans Union, it disclosed two separate accurate credit reports in response to the Chase inquiry—Plaintiff's report not containing the Dillard's account and the Imposter's report, accurately including the Dillard's account which the Imposter actually had. Under this theory, it is the non-party Chase which erroneously commingled these two reports, thereby attributing the Imposter's Dillard's account to Plaintiff.

There are two problems with Trans Union's theory: First, the evidence is equivocal that this is actually what happened. As will be discussed below in section V.C., Trans Union vigorously argues that the FCRA requires that a consumer's credit report list all the subscribers that it was disclosed to. (*See, e.g.,* TU's Motion at 11:13–19.) A copy of Trans Unions records, located as TU May Declaration Exhibit P, while difficult to fully

---

17. More accurately, Plaintiff has failed to point out to this Court any evidence in the record that the Capitol One account was not hers. Given that the parties have submitted several thousand pages of evidence, the Court has not, and need not, searched the entire record for evidence of

this fact. *See Nilsson, Robbins, et al. v. Louisiana Hydrolec,* 854 F.2d 1538, 1545 (9th Cir.1988) (district court need not search through a voluminous record to locate and identify facts helping non-moving party avoid summary judgment).

interpret, suggests that Trans Union's disclosure to Chase was of Plaintiff's file, not the Imposter's file. In this exhibit, Plaintiff is identified as "01A" while the Imposter is identified as "01B". (*See* TU May Decl.Ex. P at 204, 204A.) Consistent with this identification, numerous credit accounts that belong to Plaintiff are identified with the "01A" code. (*Id.* at 204B–204E.) The Dillard's account is identified with the "01B" code. (*Id.* at 204E.) However, the Chase inquiry is identified only with the "01A" code. (*Id.* at 204F.)

Although subject to different interpretations, this suggests that Trans Union considered the Chase disclosure to be of Plaintiff's file, not the Imposter's file. Plaintiff advanced this argument and pointed to this evidence in her Opposition, yet Trans Union failed to address it in its Reply. In the face of this evidence and argument, a jury could reasonably conclude that Trans Union did not disclose both Plaintiff's and the Imposter's file, but rather, only disclosed Plaintiff's file, which contained the Dillard's account. Thus, Plaintiff has raised a genuine issue of material fact precluding summary judgment for Trans Union on Plaintiff's accuracy claim. However, as further grounds for this decision, the Court will also address several other issues relating to the accuracy claim.

Even if the Court were to accept Trans Union's argument that it disclosed two separate reports in response to the Chase inquiry, an accurate one on Plaintiff, and an accurate one on the imposter containing the Dillard's account, that does not end the inquiry. Plaintiff argues that this procedure, supplying the Imposter's credit report in response to an inquiry about Plaintiff, is itself an inaccuracy. Under this argument, by disclosing two reports in response to one inquiry, Trans Union essentially creates an inaccurate report on Plaintiff containing the information both from Plaintiff and the Imposter. Although Trans Union considers the two reports to be separate, Plaintiff argues that it is foreseeable that the recipient of the reports may consider them to be one report.

██ Plaintiff's argument has merit. Section 1681e(b) targets not only "strictly" inaccurate information, but also information that

is "technically accurate" but nevertheless misleading. *See Pinner v. Schmidt*, 805 F.2d 1258, 1262–63 (5th Cir.1986); *Koropoulos v. The Credit Bureau*, 734 F.2d 37, 40–42 (D.C.Cir.1984) ("Congress did not limit the Act's mandate to reasonable procedures to assure only technical accuracy; to the contrary, the Act requires reasonable procedures to assure 'maximum accuracy.' [R]eports containing factually correct information that nonetheless mislead their readers are neither maximally accurate nor fair to the consumer who is the subject of the reports."); *Alexander v. Moore & Assocs., Inc.*, 553 F.Supp. 948, 952 (D.Haw.1982) (stating that consumer reporting agency cannot accurately report that a consumer was "involved" in a credit card scam without reporting that the consumer was actually one of the victims of the scam, not a perpetrator).

This Court finds that the return of separate files on Plaintiff and the Imposter in response to an inquiry about Plaintiff, may well be "technically accurate yet misleading." Although Trans Union argues that the files were "clearly presented" as separate files, (TU Reply at 4:7–12), including a "Trans Alert" message telling the subscriber that the file address did not match the inquiry address, and a message stating "possible other file to follow," (*see* TU Genuine Issues ¶¶ 21–24), Plaintiff has raised a genuine issue of material fact as to whether this presentation, taken as a whole, was misleading. The Court notes that a jury may well conclude that Trans Union's response to the Chase inquiry was not misleading. Or, a jury may conclude that even if it was misleading, Trans Union's procedures were nevertheless reasonable to "assure maximum possible accuracy." However, these are inquiries for a jury, not for this Court on a motion for summary judgment. *See Guimond*, 45 F.3d at 1333 ("[t]he reasonableness of the procedures and whether the agency followed them [in § 1681e(b) cases] will be jury questions in the overwhelming majority of cases").

### 2. The Dillard's Inquiry

Plaintiff also argues that the presence of

the Dillard's inquiry [18] on her credit report constitutes an inaccuracy.[19] Trans Union makes two arguments in response: a) that the Dillard's inquiry is accurate, and b) that reporting it is required by the FCRA. These will be addressed in turn.

### a. Was the Dillard's Inquiry Inaccurate?

Trans Union argues that it really did disclose Plaintiff's report to Dillard's in response to the Imposter's credit application there; accordingly, reporting this inquiry on Plaintiff's file is completely accurate. In a strictly technical sense, of course, this is true; it is undisputed that Plaintiff's report was disclosed to Dillard's. However, the presence of the inquiry on Plaintiff's report would seem to suggest that *Plaintiff* applied for credit with Dillard's.[20] Yet, that was not the case. Accordingly, this Court finds that Plaintiff has established a genuine issue of material fact as to whether listing the Dillard's inquiry on Plaintiff's report was misleading.

### b. Was the Dillard's Inquiry Required by the FCRA?

Trans Union also argues that the FCRA required it to list the Dillard's inquiry. (*See* TU Motion at 11:13–19.) As support, Trans Union cites to 15 U.S.C. § 1681g(a)(3), which assertedly *"requires* consumer reporting agencies to disclose the 'recipients of any consumer report on the consumer which it has furnished.'" (TU Motion at 11:15–17

(emphasis in original).) Although this quotation is "technically accurate" it is misleading; by its express terms, section 1681g(a)(3) actually required the consumer reporting agency to make the above disclosure *to the consumer*. *See* 15 U.S.C. § 1681g(a) ("Every consumer reporting agency shall, upon request and proper identification of any consumer, clearly and accurately disclose to the consumer ... (3) the recipients of any consumer report on the consumer....") This section says nothing about requiring such disclosures to be made to *creditors* of the consumer.[21]

Moreover, Trans Union's asserted compulsion to disclose rings hollow considering that it has recently changed its policy and, in cases of true name fraud such as involved here, now removes all inquiries relating to the fraudulent accounts. (*See* TU May Decl. Ex. A (Reger Depo.) at 189:24–190:7.)

For the above reasons, the Court finds that Trans Union was under no duty to report to its subscribers the fact that Plaintiff's report was disclosed to Dillard's, especially since such disclosure was made as a result of the Imposter's credit application. Consequently, Trans Union's argument that it only reported what it was required by the FCRA to report is without merit.

### 3. Plaintiff's Social Security Number in the Imposter's File

Although the parties do not discuss this next point, there is one additional possible

---

**18.** In addition to listing actual credit accounts on a credit report, credit reports also list "inquiries" which indicate all the entities which have received a copy of the report in question in the past. For example, Trans Union listed Plaintiff's credit accounts under the heading "the following accounts are reported with no adverse information." (*See* TU May Decl.Ex. K at 137.) Trans Union listed the inquiries under the heading "the following companies have received your credit report. Their inquiries remain on your credit report for two years. (Note: 'consum discl' refers to Trans Union consumer relations and are not viewed by creditors." (*Id.* at 140.) Included among the inquiries listed on Plaintiff's September 12, 1996 Trans Union report was the Dillard's inquiry. (*Id.* at 141.)

**19.** This claim is intertwined to some extent with Plaintiff's reinvestigation claim under § 1681i(a), which will be discussed below in section V.C.

**20.** This is especially true since some creditors view the number and nature of inquiries present on a credit report to be a relevant factor in evaluating credit applications. (*See* TU May Decl.Ex. N. (Beavert Depo.) at 78:25–79:16.) It is interesting to note that when Trans Union's Director of Consumer Relations and Fraud Victim Assistance, Diane Terry, was herself the victim of identity fraud, she had the inquiries removed from her credit file (although at other consumer reporting agencies, not Trans Union). (TU May Decl.Ex. Q (Terry Depo.) at 55–59.)

**21.** That Trans Union reported the Dillard's inquiry to its subscribers, not merely to Plaintiff herself, is shown by the wording on the report. *See supra* note 18 ("inquiries remain on your credit report for two years").

inaccuracy making summary judgment inappropriate. In its Statement of Uncontroverted facts, Trans Union states that "[o]n June 5, 1995, Trans Union maintained in its computerized files a file relating to 'Andrea Andrews,' which contained the same social security number as plaintiff and the Dillard's account referenced in the Chase Credit report." (TU Stmt. Uncontroverted Facts ¶ 38.) In other words, Trans Union's file on the Imposter contained Plaintiff's social security number. In *Lowry v. Credit Bureau, Inc.*, 444 F.Supp. 541 (N.D.Ga.1978), the credit agency's motion for summary judgment on a § 1681e(b) claim was denied, because of the presence of that plaintiff's (James Francis Lowery's) social security number in the file of one James Frank Lowery. *See id.* at 544.

It is true that *Lowry* arose in a different context, as that case did not involve identity fraud. In *Lowry*, the plaintiff's social security number was included in the other person's file as a result of one of the agency's subscriber's actions. *Id.* The court found that this inaccuracy might have arisen from a failure to have reasonable procedures to assure maximum possible accuracy. *Id.* In the instant case, Plaintiff's social security number was included in the Imposter's file presumably as a result of the Imposter's intentional misrepresentation of herself as Plaintiff. Nevertheless, this distinction goes to the reasonableness of the agency's procedures, and not to whether the inclusion of a consumer's social security number in someone else's file is an inaccuracy. It may well be that Plaintiff's social security number wound up in the Imposter's file despite Trans Union's reasonable procedures. But, as *Guimond* teaches, this is a question for the jury in the "overwhelming majority of cases." *See Guimond*, 45 F.3d at 1333.

It is for all of the above reasons that Trans Union's Motion for Summary Judgment on Plaintiff's accuracy claim under § 1681e(b) is DENIED.

22. Moreover, it is apparently undisputed that Trans Union contacted Dillard's, determined that the Dillard's account was fraudulently obtained and did not belong to Plaintiff, and suppressed the Dillard's account from Plaintiff's credit re-

### C. Plaintiff's "Reinvestigation" Claim

Plaintiff's third cause of action, her "reinvestigation" claim, asserted only against Defendant Trans Union, is made under § 1681i(a). This section provided that:

> If the completeness or accuracy of any item of information contained in his file is disputed by a consumer, and such dispute is directly conveyed to the consumer reporting agency by the consumer, the consumer reporting agency shall within a reasonable period of time reinvestigate and record the current status of that information unless it has reasonable grounds to believe that the dispute by the consumer is frivolous or irrelevant. If after such reinvestigation such information is found to be inaccurate or can no longer be verified, the consumer reporting agency shall promptly delete such information. The presence of contradictory information in the consumer's file does not in and of itself constitute reasonable grounds for believing the dispute is frivolous or irrelevant.

15 U.S.C. § 1681i(a). Although Plaintiff's Complaint alleges that Trans Union failed to remove the Dillard's account in a timely manner and that Trans Union tried to shift the reinvestigation burden onto Plaintiff, (Complaint ¶ 17), Plaintiff appears to have abandoned these arguments, as she fails to argue them in her Opposition.[22] Instead, Plaintiff's reinvestigation claim now appears to be based only on the Dillard's inquiry[23] appearing in her report as late as September 1996.

Much as she argues in her accuracy claim as described above in section V.B.2., Plaintiff argues that Trans Unions' reporting of the Dillard's inquiry constitutes inaccurate information which she disputed and which she conveyed that dispute about to Trans Union. Under this argument, Trans Union violated § 1681i(a) when it failed to remove the inquiry from Plaintiff's report following its reinvestigation.

ports, all within less than three weeks of Plaintiff first informing Trans Union of the problem. (*See* TU Genuine Issues ¶¶ 39, 48–52.)

23. This inquiry was described above in note 18.

In contrast, Trans Union argues, much as it did on Plaintiff's accuracy claim, that the Dillard's inquiry was accurate and its presence on Plaintiff's report was mandated by 1681g(a)(3). These arguments have been addressed above. A jury could reasonably conclude that listing the Dillard's inquiry, especially after Trans Union *knew* that it was generated as a result of the Imposter's credit application, is inaccurate. Further, as discussed above, the FCRA did not require such disclosures to be made to creditors; only to the consumer herself. *See* 15 U.S.C. § 1681g(a).

Trans Union also argues that even if Plaintiff was not subjectively content with Trans Union's reinvestigation, the issue is whether their reinvestigation was reasonable, taking into account that the standard under § 1681i is less stringent than that imposed by § 1681e(b). (*See* TU Motion at 16:3–8.) Although the standard under § 1681i is lower than under § 1681e(b), this Court certainly cannot conclude as a matter of law that it was reasonable for Trans Union to continue reporting the Dillard's inquiry on Plaintiff's credit reports, even after determining that "the Dillard's account was obtained fraudulently and did not belong to plaintiff." (TU Genuine Issues ¶ 51.)

Finally, Trans Union argues that it "had no obligation to investigate or remove the inquiry because plaintiff never requested such action by Trans Union." (TU Reply at 5:20–21.) As quoted above, § 1681i(a) does indeed require the consumer to "dispute" the information, and convey that dispute directly to the consumer reporting agency. 15 U.S.C. § 1681i(a). However, a jury could reasonably conclude that Plaintiff's June 6, 1995 letter to Trans Union stating that she "*did not request credit* nor [is she] the person who is now not paying those [including the Dillard's account] bills," (TU May Decl.Ex. E (emphasis added)), constitutes a dispute and a conveyance of that dispute to Trans Union. Based on that letter, especially the fact that it states that Plaintiff never requested credit from Dillard's, a jury may conclude that it should have been clear to Trans Union that the inquiry related to the Imposter's activi-

ties, not to Plaintiff's, and that it thus should have been deleted.

For the foregoing reasons, Trans Union's Motion for Partial Summary Judgment on Plaintiff's reinvestigation claim under § 1681i(a) is DENIED.

**D. Plaintiff's Economic Damages**

■ Defendant TRW seeks summary adjudication that Plaintiff did not suffer any economic damages as a result of the report which TRW provided to Chase on May 31, 1995. As described above, Plaintiff visited Home Savings on that date to inquire about refinancing her home mortgage. Home Savings obtained a report from Chase, which Chase prepared by combining reports from TRW, Trans Union, and non-party Equifax. The Chase report listed the Imposter's Dillard's account as being delinquent. (Cohan Depo.Ex. 151 (the Chase Report) at 3.) This information was attributed to Trans Union and/or TRW. (*Id.*) After seeing this derogatory information on the Chase report, Plaintiff did not apply for the loan with Home Savings, allegedly believing that it would not be approved. Instead, she obtained a second trust deed equity line with Merrill Lynch, allegedly at a higher interest rate.

It is undisputed that on May 31, 1995, the date of the Chase report, TRW's computer files indicated that the Dillard's account was current and being paid on time. (TRW Genuine Issues ¶ 20.) TRW argues that this proves that it was Trans Union, not TRW, which reported the Dillard's account as being delinquent. This argument is well taken. The Chase report indicates that the Dillard's account was reported by TRW and/or Trans Union, and since it is undisputed that TRW believed the Dillard's account to be current, it necessarily must have been Trans Union which reported the delinquency. Regardless, it could not have been TRW reporting the delinquency; at least, Plaintiff provides no evidence suggesting that it could have been.

Instead, Plaintiff argues that the mere fact that TRW was reporting the Dillard's account at all served to confirm Trans Union's reporting of that account as delinquent. (*See* TRW Opp. at 27–28.) The Court does not

accept this argument. Plaintiff offers no evidence (or even argument) that the Chase report would have been different had TRW not reported the Dillard's account at all. It is not as if Chase only reported information that it obtained from at least two sources; there are numerous entries on the Chase report that were reported by only one agency. (*See* TRW May Decl.Ex. B (the Chase Report) ("Assoc Finc" reported only by Trans Union; Capitol One reported only by Trans Union; Citibank reported only by CBI; MBGA reported only by Trans Union; Silverwoods reported only by TRW; and U.S. West reported only by CBI).)

Plaintiff next argues that TRW is liable because "based on the [Chase] report, Plaintiff and Mr. Beavert [the Home Savings loan person] each actually concluded that both TRW and Trans Union were reporting the delinquency." (TRW Opp. at 28.) This argument is without merit. It is irrelevant what Plaintiff and Mr. Beavert may have (erroneously) concluded from the Chase report; TRW cannot be held responsible for the erroneous inferences drawn from a document it did not prepare.[24]

24. Under Plaintiff's theory, had Chase completely mangled the report it received from TRW, and falsely indicated that accounts which actually belonged to Plaintiff and were reported by TRW as current were not current, TRW would be liable. This clearly makes no sense.

25. Another problem with Plaintiff's claim for economic damages arising out of the Chase report is that she was never denied the Home Savings loan, because she never applied for it. Plaintiff argues that the reason she never applied was that she was dissuaded from applying based on the mistakes in the Chase report. Under the right circumstances, this argument would have merit; there is no requirement in the FCRA that a consumer actually be denied credit to have a claim for damages. However, in this case, Plaintiff states that it was "her understanding that the loan could not be approved without *clearing up* [the Dillard's delinquency.]" (TRW Opp. at 28:23–24 (emphasis added).) Based on this, Plaintiff obtained a higher priced loan from Merrill Lynch. Beavert, the Home Savings Loan person, testified that not only would he not have discouraged Plaintiff from applying for the Home Savings loan, it was his opinion that had she applied, she would have received the loan. (Lussier Decl.Ex. P (Beaverton Depo.) at 41:13–42:24.) It is true that Beaverton did not have final decision making authority to approve loans.

The only way that TRW's reporting of the Dillard's account could have contributed in any way to Plaintiff's economic damages caused by the Chase report, would be if Home Savings would have considered the Dillard's account, reported as current and being paid on time, as a negative. Plaintiff provides no evidence that this is so, likely because common sense indicates that it is not so. Moreover, TRW provides evidence that the Dillard's account, reported as current, would actually have been a favorable factor in determining whether Home Savings would refinance Plaintiff's loan. (Lussier Decl.Ex. P. (Beaverton Depo.) at 39:5–40:14.) Thus, TRW's report on Plaintiff to Chase did not cause her any economic damages; consequently, TRW cannot be liable for those economic damages.[25] Accordingly, TRW's Motion for Summary Adjudication of this issue is GRANTED.

### E. Plaintiff's State Law Claim

Although Plaintiff asserts her state law claim against both Defendants, only Trans Union moves for partial summary judgment on this claim. Trans Union makes two arguments in support of its Motion on this issue.

(TRW May Decl.Ex. 6 at 9:24–10:2.) Nevertheless, as the Home Savings Loan Consultant, Beaverton has foundation to offer an opinion on the likelihood of a loan being approved.

More importantly, it is undisputed that TRW deleted all references to the fraudulent accounts from Plaintiff's file within 30 days of being told of the problem. (*See* Pl.'s Compl. ¶ 17.) This is why Plaintiff's reinvestigation claim is asserted only against Trans Union, and not TRW. And as discussed above, even Trans Union had deleted the Dillard's account, leaving only the inquiry, within three weeks of Plaintiff's Home Savings visit. Thus, within a month or less, Plaintiff had "resolved" the Dillard's matter. Yet Plaintiff never applied for the Home Savings Loan, choosing instead to apply for the allegedly higher-priced Merrill Lynch loan. Consequently, Plaintiff has not met her burden of showing a genuine issue of material fact that TRW caused her any economic damages as a result of the Chase report. *See Ladner v. Equifax Credit Information Servs.*, 828 F.Supp. 427, 432 (S.D.Miss.1993) (granting summary judgment, finding no economic damages; the plaintiff had failed to apply for a loan after being told that the (erroneous) information on her report would cause her application to be denied; the plaintiff offered no explanation why she did not apply for the loan after resolving the problems in her report).

First, Trans Union argues that Plaintiff's state law claim under California Business and Professions Code § 17200 *et seq.* "must fail because, as demonstrated above, plaintiff has failed to prove any predicate violations of the FCRA." (TU Motion at 25.) This argument is predicated on Trans Union's belief that it would win summary judgment on all of Plaintiff's FCRA claims. Since this is not the case, as explained above, this argument necessarily fails. If Plaintiff proves her FCRA claims, that would also prove her section 17200 claim. *See Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*, 17 Cal.4th 553, 71 Cal.Rptr.2d 731, 950 P.2d 1086 (1998) (section 17200 includes "anything that can properly be called a business practice and that at the same time is forbidden by law").

Trans Union's second argument is that Plaintiff has only pled a claim for damages, which are not available under the California statute. (*Id.*) This is a mischaracterization of Plaintiff's Complaint, which clearly seeks injunctive relief and disgorgement of any profits resulting from Defendants' unlawful acts of failures to act. (Compl.¶¶ 39, 40.) Plaintiff's entitlement to injunctive relief will be addressed below.

■■■ However, Plaintiff is potentially entitled to disgorgement, if she proves her claims. *See People v. Thomas Shelton Powers, M.D., Inc.*, 2 Cal.App.4th 330, 339, 3 Cal.Rptr.2d 34 (1992) ("there is little question but that the broad range of remedies provided for [in section 17203] includes restitution and/or disgorgement of profits"). Initially, although *Powers* was brought by the San Francisco District Attorney under section 17204, this section also permits suits by private individuals acting on behalf of the general public. *See* Cal.Bus. & Prof.Code § 17204. Plaintiff's Complaint alleges that she is acting on behalf of the general public. (Compl.¶ 40.) Moreover, the Powers court rejected the argument that "a wrongdoer should be entitled to retain its illegal profits simply because there is no cognizable direct victim to be made whole." *Powers*, 2 Cal. App.4th at 341, 3 Cal.Rptr.2d 34. The court stated that:

disgorgement [is] authorized so that illicit profits may be disgorged to some entity or party in a position to use it to correct, as much as possible, the harm wrought by the unfair practice. [T]he laws against unfair business practices were drafted in large part to prevent a wrongdoer from retaining the benefits of its illegal acts. That purpose would be frustrated if a party were entitled to retain its profits simply because it is difficult to specify the victim.

*Id.* at 341–42, 3 Cal.Rptr.2d 34. Thus, while this Court certainly expresses no view on the likelihood that Plaintiff will prevail on her state law claim in the end, Trans Union has failed to meet its initial burden of showing a lack of genuine issues of material fact. Accordingly, Trans Union's Motion for Partial Summary Judgment on this issue is DENIED.

**F. Plaintiff's Punitive Damages Request**

■■■ Plaintiff seeks punitive damages against each Defendant, and each Defendant has moved for partial summary judgment on this request. After setting out the appropriate legal standards, the Court will address each Defendant's Motion in turn.

The FCRA provided that:

Any consumer reporting agency or user of information which willfully fails to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer in an amount equal to the sum of ... (2) such amount of punitive damages as the court may allow....

15 U.S.C. § 1681n. Although punitive damages are permitted even without malice or evil motive, the violation must have been willful. *Pinner v. Schmidt*, 805 F.2d 1258, 1263 (5th Cir.1986) (vacating jury award of punitive damages). Although " 'willful' is a word of many meanings," one definition that is often used in this context is "knowingly and intentionally committed an act in conscious disregard for the rights of others." *See id.* at 1263; *Stevenson v. TRW, Inc.*, 987 F.2d 288, 293–94 (5th Cir.1993).

The Fifth Circuit has held that "only defendants who engaged in willful misrepresentations or concealments have committed a willful violation." *Stevenson*, 987 F.2d at

294. The Third Circuit, while declining to adopt this holding, did hold that "to justify an award of punitive damages, a defendant's actions must be on the same order as willful concealments or misrepresentations." *Cushman v. Trans Union Corp.*, 115 F.3d 220, 227 (3d Cir.1997).

### 1. Trans Union's Motion

██ As described above, a jury could reasonably conclude that listing the Dillard's inquiry on Plaintiff's credit report was inaccurate, and possibly in violation of Trans Union's duty to reinvestigate. Further, as also discussed above, the FCRA did not require such disclosures to be made to creditors; only to the consumer herself. *See* 15 U.S.C. § 1681g(a). This Court finds that a jury could also reasonably conclude that listing the Dillard's inquiry on Plaintiff's credit report, especially after conclusively determining that the inquiry was generated by the Imposter, was an act knowingly and intentionally done in conscious disregard for Plaintiff's rights. Such a finding would permit an award of punitive damages under § 1681n; accordingly, Trans Unions Motion for Partial Summary Judgment on this issue is DENIED.

Since the above is sufficient grounds for denying Trans Union's Motion, the Court need not address whether Plaintiff may be entitled to recover punitive damages from Trans Union under other grounds. However, some of the discussion below on TRW's Motion for Partial Summary Judgment on Plaintiff's punitive damage request is also applicable to Trans Union.

### 2. TRW's Motion

██ TRW's Motion for Partial Summary Judgment on the punitive damages issue presents a closer call. Plaintiff's Opposition on this issue can be broken down into two arguments:[26] that TRW reported two of the Imposter's collection accounts on Plaintiff's

report after the Imposter's activities came to light, and that TRW made conscious business decisions regarding its procedures despite knowledge of the growing problem of identity fraud.

Plaintiff's first argument is based on a March 26, 1996, "Merged Profile Report" by Strategic Mortgage Services which indicates that TRW reported Plaintiff had two accounts which had gone to collections. (*See* TRW May Decl.Ex. Q at 191.) This report indicated that TRW reported one of these accounts in October 1995, and another in July 1995. (*Id.*) Both reports were made after TRW became aware of Plaintiff's Imposter problem in June 1995.

Although Plaintiff argues that TRW reported these two accounts "for its own customers' preferences," (TRW Opp. at 33–34), this Court is hard-pressed to understand why any of TRW's customers would prefer to receive erroneous information. Plaintiff points to no evidence that she had informed TRW that these two collections accounts belonged to the Imposter, nor did Plaintiff allege any reinvestigation claim against TRW. The appearance of these erroneous accounts on Plaintiff's report may indicate TRW's negligence, but they do not support Plaintiff's claim of willfulness. *See Philbin v. Trans Union Corp.*, 101 F.3d 957, 970 (3d Cir.1996) (finding no genuine issue of material fact as to willfulness, despite the defendant's failure to correct the reappearance of deleted erroneous information after being told of it).

Plaintiff also argues that TRW made conscious decisions about how to run its business, and that choosing to program its computers in the way it did, coupled with TRW's awareness of the growing problem of identity fraud, constitutes willful noncompliance with the FCRA, supporting punitive damages. Plaintiff argues that TRW elected to market separate products to combat fraud[27] at an additional fee, rather than use its limited computer capacity[28] to improve accuracy in

---

26. A third argument, that Plaintiff's § 1681e(a) "disclosure" claim supports punitive damages needs not be considered in light of this Court's determination that TRW's disclosures did not violate § 1681e(a).

27. Plaintiff provides Experian's "product catalog" from its Internet site, which details various products/services available. (*See* TRW May Decl. Ex. 10.)

28. Plaintiff presents deposition testimony by Helen McMillan, a "subteam leader of the database

its ordinary credit reporting system. (*See* TRW Opp. at 34.)

There are several problems with this theory. First, the evidence of "optional" products is taken from Experian's Internet site on November 6, 1997. (TRW May Decl.Ex. 10.) The events relevant to this case took place more than two years prior to that. Plaintiff does not point to evidence showing that TRW offered the same services during the relevant time period. Far more importantly, however, Plaintiff fails to substantiate the connection between these optional products and any deficiencies in TRW's operation constituting a violation of the FCRA.

Even accepting Plaintiff's contentions that TRW offered these services, and that TRW's computer system ran at full capacity, there is no showing that this represents a knowing and intentional act in conscious disregard for the rights of others. *Pinner*, 805 F.2d at 1263; *Stevenson*, 987 F.2d at 293–94. TRW's computers had sufficient capacity to do what they were asked to do. In turn, TRW programmed the computers to perform in a manner which TRW presumably believed to be consistent with the dictates of the FCRA. TRW may well have been wrong about its procedures being in compliance with the FCRA. Indeed, TRW may well have been negligent. But Plaintiff fails to produce evidence that TRW acted in conscious disregard for anyone's rights.

Under Plaintiff's theory, because TRW "intentionally" programmed its computers the way it did, then any FCRA violations occurring as a result of this intentional action are willful, and subject to liability for punitive damages. But this argument turns all FCRA violations involving impostors into willful violations, since every consumer reporting agency makes intentional choices about how to program its system. Willfulness requires more. Plaintiff has produced no evidence that TRW's actions constituted willful concealments or misrepresentations, *see Stevenson*, 987 F.2d at 294, or were on the same order as willful concealments or

architect effort" at TRW, stating that it was not a "normal operation to have excess [computer] capacity in the data center" during the pertinent years, and that she was not aware of any time

misrepresentations, *see Cushman*, 115 F.3d at 227, or were otherwise in conscious disregard for Plaintiff's rights, *see Pinner*, 805 F.2d at 1263.

For the above reasons, TRW's Motion for Partial Summary Judgment on the issue of punitive damages is GRANTED.

## G. Plaintiff's Injunctive Relief Request

Plaintiff seeks injunctive relief against each Defendant, and each Defendant has moved for partial summary judgment on this request. Because the grounds relied on by each Defendant are different, the Court separately discusses each Defendant's Motion.

### 1. TRW's Motion

TRW points out that it is undisputed that as of September 19, 1996, it was no longer a consumer reporting agency, having transferred control and ownership of its credit reporting business to Experian. (TRW Genuine Issues ¶ 2; Goldston Decl. ¶ 3.) Nor does TRW have any plans to reenter the credit reporting business. (*Id.*) TRW then argues that this turn of events makes any request of injunctive relief against it moot. *See United States v. W.T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953) (stating that case may be moot if the defendant can demonstrate that "there is no reasonable expectation that the wrong will be repeated"); *Snelling & Snelling, Inc. v. Armel, Inc.*, 360 F.Supp. 1319, 1321 (W.D.La. 1973) (request for injunction to restrain violation of covenant not to compete need not be considered by the court where defendant had ceased business operations two years before).

█ Plaintiff argues that injunctive relief in this case is proper, because "courts sitting in equity may issue an injunction against a business that would pass to its successors or assigns." (TRW Opp. at 35.) Thus, the issue for this Court to decide is whether it could issue an injunction against TRW in this case which would bind Experian. The Rule governing injunctions states that:

when TRW's Legacy system was in place that there was substantial excess capacity in the computer system. (TRW May Decl.Ex. U. (McMillan Depo.) at 135.)

> Every order granting an injunction ... is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.

Fed.R.Civ.Proc. 65(d). Despite this seemingly clear command, Plaintiff is correct that under the right circumstances, injunctions may bind successors and assigns. *See Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973). However, *Golden State* involved an injunction which issued *before* the assignment in question, and specifically held that "a bona fide purchaser, *acquiring with knowledge* that the wrong remains unremedied, ... may be considered in privity with its predecessor for purposes of Rule 65(d)." *Id.* at 180, 94 S.Ct. 414. (emphasis added). This holding is unremarkable; a contrary result allowing a named party to avoid the effects of an injunction merely by transferring assets to a third party would provide an easy method of defying court orders. *See Herrlein v. Kanakis*, 526 F.2d 252, 255 (7th Cir.1975).

■ The facts of the case at bar demonstrate that successor liability is unavailable. TRW transferred its credit reporting business on or before September 19, 1996. (TRW Genuine Issues ¶ 2.) Plaintiff filed her Complaint on October 21, 1996, more than month later. Therefore, not only had the injunction not yet been issued as of the time of the assignment, but the underlying litigation had not yet even commenced. Thus, there is no chance that TRW's assignment was an effort to defy a court order. *See Herrlein*, 526 F.2d at 255.

In essence, Plaintiff asks this Court to issue an injunction binding Experian should she prove that TRW violated the FCRA. Given the lack of notice to Experian at the time it took over TRW's business of this suit's pendency (since this suit had not yet been filed), such a process raises grave due process concerns. For example, TRW has little or no motivation to assure that the terms of any injunction ultimately issued are as minimally intrusive as necessary, since TRW itself is not affected by any such injunction. On the other hand, Experian, who would bear the brunt of the injunction under Plaintiff's theory, has no opportunity to participate in this litigation. The Supreme Court was careful to note in *Golden State* that the successor there was made a party to the proceedings, and as a result had a full opportunity to be heard. *See Golden State*, 414 U.S. at 180–81, 94 S.Ct. 414.

If Plaintiff wanted to obtain injunctive relief against Experian, she could have sought to join Experian as a defendant. *See Herrlein*, 526 F.2d at 255. There is evidence that Plaintiff's counsel were aware almost two years ago that TRW was transferring its credit reporting business to Experian. (McLoon Decl. ¶ 3.) In any event, this Court cannot enjoin Experian as TRW's successor, because there is no evidence that Experian had any knowledge of this suit at the time it acquired the business from TRW; indeed, this suit had not yet even been filed. And, since there is no justification for any injunction against TRW,[29] which itself is no longer covered by the FCRA, TRW's Motion for Partial Summary Judgment on this issue is GRANTED.

## 2. Trans Union's Motion

Trans Union, which is still in the credit reporting business, necessarily relies on different arguments than TRW in asserting that Plaintiff is not entitled to injunctive relief. Essentially, Trans Union makes two arguments: that Plaintiff has not stated her requested relief in specific enough terms, and that individual plaintiffs are not entitled to

**29.** *Norman–Bloodsaw v. Lawrence Berkeley Lab.*, 135 F.3d 1260 (9th Cir.1998) is not to the contrary. In that case, the defendants had merely voluntarily ceased their conduct; the Ninth Circuit noted that the defendants offered no reason why they might not return to their unlawful conduct in the future. *Id.* at 1274. Moreover, in that case injunctive relief might have been necessary to remedy the effects on the plaintiffs of the unlawful conduct of defendants. *Id.* at 1275. In the case at bar, in contrast, it is undisputed that TRW fully repaired Plaintiff's credit file, deleting all reference to the Imposter's activities. Thus, this is not a case where a court order might be appropriate to order changes made to Plaintiff's file (at least as against TRW).

injunctive relief. These will be addressed in turn.

### a. Specificity of any Injunctive Relief Granted

 Trans Union argues that Plaintiff has failed to "state her proposed request for relief in 'specific' terms, and 'reasonable detail,'" citing Federal Rule of Civil Procedure 65(b). (TU Motion at 26.) Rule 65(d) requires that *"every order granting an injunction . . . shall be specific in terms; [and] shall describe in reasonable detail . . . the act or acts sought to be restrained. . . ."* Fed. R.Civ.Proc. 65(d) (emphasis added).

Initially, it must be observed that this rule does *not* state that "oppositions to motions for summary judgement shall be specific in terms. . . ." Trans Union cites no authority for its implied proposition that Plaintiff has any burden at this stage of the litigation to articulate a proposed injunction. Nor has this Court located any. Rather, Trans Union's argument appears to this Court to be premature; should Plaintiff prevail at trial, and should this Court decide that injunctive relief was appropriate, then this Court would have the obligation to draft the appropriate order, considering the suggestions of Plaintiff and the opposition of Trans Union. Any difficulties in drafting such an order are better addressed at that time. The Court declines Trans Union's invitation to hold at this time that no matter what evidence is presented at trial, the Court will be unable to frame an appropriate order.

### b. Is an Individual Plaintiff Entitled to Injunctive Relief?

 Trans Union also argues that the "FCRA does not support an individual's claim for injunctive relief." (TU Motion at 26.) Initially it must be noted that Plaintiff also seeks injunctive relief under her state law claim. (Compl.¶¶ 38–40.) Section 17204 permits members of the public acting as private attorney generals to seek injunctive relief on behalf of the public. Cal.Bus. & Prof.Code § 17204; *see also Stop. Youth Addiction,* 17 Cal.4th at 564, 71 Cal.Rptr.2d 731, 950 P.2d 1086 (citing cases). This alone is enough to require Trans Union's Motion for Partial Summary Judgment on the issue of injunctive relief to be DENIED.

Whether or not the FCRA allows private litigants, as opposed to the Federal Trade Commission, to obtain injunctive relief broader than necessary to vindicate the individual plaintiff's rights, is a complicated question. Several district courts have held that the absence of any affirmative grant of equitable powers to individuals in the FCRA[30] bars broad "private attorney general" injunctive relief to individuals. *See Ditty v. Checkrite,* 973 F.Supp. 1320, 1338 (D.Utah.1997); *Mangio. v. Equifax, Inc.,* 887 F.Supp. 283 (S.D.Fla.1995);[31] *Kekich v. Travelers Indem. Co.,* 64 F.R.D. 660 (E.D.Pa.1974). In contrast, at least one case has allowed an individual to obtain such broad injunctive relief. *See Greenway v. Information Dynamics, Ltd.,* 399 F.Supp. 1092 (D.Ariz.1974), *aff'd,* 524 F.2d 1145 (9th Cir.1975).[32] Further complicating matters, several of these cases were class actions.

 However, this Court need not resolve this question of whether the FCRA allows an individual plaintiff to function as a private attorney general, because clearly § 17200 does, as described above. Thus,

---

**30.** *Compare* 15 U.S.C. §§ 1681n, 1681o (creating liability for willful and negligent noncompliance, including damages, attorney's fees, and for willful noncompliance, punitive damages) *with* 15 U.S.C. § 1681s (giving equitable enforcement powers to the FTC).

**31.** *Mangio* went further than the other two cases, *Ditty,* and *Kekich,* holding that the plaintiff in *Mangio,* suing over information in his credit report which actually pertained to another individual, could not obtain injunctive relief requiring the consumer reporting agency to remove the inaccurate information from *his own* file. *Man-*

*gio,* 887 F.Supp. at 284. The other two cases involved plaintiffs seeking broad injunctive relief affecting the public, not merely their own interests. *See Ditty,* 973 F.Supp. at 1338; *Kekich,* 64 F.R.D. at 667.

**32.** The Ninth Circuit did not discuss the availability of broad injunctive relief to private litigants, but merely "adopt[ed] the careful reasoning of Judge Copple." *Greenway,* 524 F.2d at 1146. Likewise, the district court never discussed whether, and to what extent, injunctive relief was a remedy provided for by the FCRA.

Plaintiff is entitled to seek such injunctive relief, regardless of whether she can seek it directly under the FCRA. Moreover, even if the FCRA does not allow injunctive relief on behalf of the public, this Court finds that it does allow injunctive relief on the plaintiff's own behalf.[33] As of September 12, 1996, Plaintiff's Trans Union report still listed the Dillard's inquiry. (*See* TU May Decl.Ex. K at 141.) The Court has not located a more recent copy of Plaintiff's credit report in the mass of evidence submitted, and it is unclear whether Trans Union's current file on Plaintiff indicates the Dillard's inquiry.[34] If it does, then Plaintiff may be entitled to an order requiring Trans Union to remove it.

For the above reasons, this Court DENIES Trans Union's Motion for Partial Summary Judgment on the injunctive relief issue.

### VI. Conclusion

For the foregoing reasons, the Court hereby orders that:

Defendant Trans Union's Motion for Summary Judgment is GRANTED in part and DENIED in part as follows:Defendant Trans Union's Motion on Plaintiff's improper disclosure (§ 1681e(a)) claim is GRANTED. Defendant Trans Union's Motion on Plaintiff's accuracy (§ 1681e(b)) claim, reinvestigation (§ 1681i(a)) claim, state law (§ 17200) claim, request for punitive damages, and request for injunctive relief is DENIED.

Defendant TRW's Motion for Partial Summary Judgment is GRANTED in all respects, including Plaintiff's improper disclosure (§ 1681e(a)) claim, request for punitive damages, and request for injunctive relief.

---

**33.** Thus, this Court disagrees with *Mangio*, 887 F.Supp. at 284, which held that the plaintiff in that case could not even obtain injunctive relief requiring the consumer reporting agency to remove the inaccurate information from his own file. This result, based on cases interpreting the Fair Debt Collection practices Act ("FDCPA"), makes little sense. Moreover, it fails to recognize differences between the FDCPA and the FCRA, and it fails to consider the purpose of the FCRA. *See Guimond*, 45 F.3d at 1333 (the FCRA was crafted to protect consumers from the transmission of inaccurate information about them and to establish credit reporting practices utilizing accurate, relevant, and current information; to accomplish these goals the FCRA should be liberally interpreted). Additionally, *Mangio* ignores Supreme Court precedent. *See Califano v.*

Additionally, Defendant TRW's Motion for Summary Adjudication that Plaintiff did not incur any economic damages in the form of higher interest expenses relating to TRW's furnishing her credit report to Chase is likewise GRANTED.

### IT IS SO ORDERED.

*Yamasaki*, 442 U.S. 682, 705, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979) ("absent the clearest command to the contrary from Congress, federal courts retain their equitable power to issue injunctions in suits over which they have jurisdiction"). The FCRA contains no "clear command" that injunctive relief is unavailable; consequently, it is available. Whether or not it is available on behalf of the public at large, however, is a question of standing that the Court need not resolve, as discussed above.

**34.** Although the credit report states that inquiries remain on the report for two years, which suggests that the Dillard's inquiry is long gone, the Court has found no evidence that the Dillard's inquiry is in fact no longer listed.